IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Daniel J. Dix, | : | Case No. 3:09 CV 0150 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |
| | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*. Pending are the parties' Briefs on the Merits (Docket Nos. 11 & 14). For the following reasons, the Commissioner's decision is affirmed.

## I. PROCEDURAL BACKGROUND

On March 7, 2005, Plaintiff filed applications for SSI and DIB alleging that he had been disabled since November 3, 1999 (Tr. 67-69; 72-74). The application for DIB was denied initially and on reconsideration (Tr. 56-58; 50-52). On June 2, 2008, Plaintiff, represented by counsel, and Vocational Expert (VE) Joseph Thompson, appeared and testified before Administrative Law Judge (ALJ) Roy Liberman (Tr. 516). The ALJ rendered an unfavorable decision on June 20, 2008 (Tr. 14-24). The Appeals Council denied Plaintiff's request for review rendering the ALJ's decision the final decision of the

Commissioner (Tr. 5-8). Plaintiff filed a timely request for judicial review in the United States District Court for the Northern District of Ohio, Western Division.

## II. FACTUAL BACKGROUND

**A.    Plaintiff's Testimony**.

Plaintiff was 54 years of age and resided with his spouse (Tr. 520). He had completed the tenth grade and later received a G.E.D. (Tr. 522). Plaintiff was last employed in November 1999 as a carpenter in the construction industry. His jobs involved building foundations for bridges and stadiums. Apparently, while working in 1999, Plaintiff tore his rotator cuff and right bicep muscle (Tr. 522). Plaintiff applied and was denied worker compensation benefits (Tr. 523).

Plaintiff had his first surgery in 2003 to repair bone touching bone in his collarbone (Tr. 523). Subsequently, he had surgery to repair a torn rotator cuff (Tr. 524). Plaintiff tried physical therapy and work conditioning (Tr. 525). He attributed the deterioration of his shoulder to the physical therapist (Tr. 527). Plaintiff took Vicodin for pain (Tr. 529).

Plaintiff only drove short distances because his arms became numb (Tr. 521). He could not use his right hand to perform simple daily or self-care activities (Tr. 526). He was able to "do a little" lawn work (Tr. 531). Plaintiff did prepare most of the meals (Tr. 532).

Plaintiff consulted a psychologist to address some unresolved emotional issues (Tr. 528). His prescribed medication was deemed unsafe; therefore, Plaintiff did not take it (Tr. 529).

A month prior to the hearing, Plaintiff began working part-time at Target stocking shelves (Tr. 530). When not working he cared for his cats and "putzed" around the house (Tr. 530).

**B.     VE Testimony.**

An individual of Plaintiff's age and past work history prevented from using his or her right dominant arm, able to lift twenty pounds with the left arm occasionally and an ability to sit, stand and walk, could perform work in the light, unskilled occupational base. Positions such as production inspector, machine tender and cashier would apply within the Northwest Ohio labor market. There were 500, 750 and 1,500 jobs, respectively, in these categories (Tr. 536).

As a production inspector, the individual would stand at a line and inspect plastic. Lifting would be limited typically to ten pounds. A machine tender would be responsible for starting and stopping machinery, setting some basic controls, monitoring the machine and monitoring the machine's production. In the cashier position, the individual would collect money for a specified transaction and distribute change (Tr. 538). The levels of concentration in these jobs are consistent with unskilled tasks, one to two-step instructions, limited verbal interaction and limited supervisory responsibilities (Tr. 539).

### III.  MEDICAL EVIDENCE

Plaintiff was treated in the emergency room for a right wrist burn on December 30, 1998 (Tr. 368).

On May 26, 1999, Plaintiff was treated on an emergency basis for flu-like symptoms. He was diagnosed with sinusitis (Tr. 330, 333). At various times during the day of treatment, Plaintiff's blood sugar levels exceeded the recommended normal levels. Plaintiff's white blood cell count exceeded normal levels. There was evidence of a few benign-appearing squamous epithelial cells and rare red blood cells (Tr. 361).

On November 4, 1999, Plaintiff presented to the emergency room with right shoulder pain. He was diagnosed with acute right shoulder strain. There was evidence of some slight acromioclavicular degenerative changes and mild arthritic changes (Tr. 163, 188).

Plaintiff was treated again on November 15, 1999 for right shoulder pain (Tr. 164). On November

17, 1999, Plaintiff was diagnosed with a probable partial rotator cuff tear with bursitis along the top of the shoulder blade (Tr. 138).

The X-ray of Plaintiff's right shoulder taken on May 22, 2003, showed normal alignment of all parts of the joint. There was no evidence of fracture or dislocation (Tr. 140). Results from the magnetic resonance imaging (MRI) of Plaintiff's right shoulder administered on June 6, 2003, showed moderate tendinosis and osteoarthritis (Tr. 189).

The pathologic diagnosis based upon an X-ray of Plaintiff's right shoulder, administered on July 23, 2003, revealed evidence of osteoarthritis (Tr. 187). On July 23, 2003, Dr. James R. Berry, an orthopedic surgeon, administered a distal clavicle excision and partial excision of the acromion in the right shoulder (Tr. 144). The postoperative examination conducted on November 25, 2003, revealed vestiges of pain lingering at the site (Tr. 151). In December 2003, Dr. Berry ordered Plaintiff to take Bextra daily (Tr. 152).

On January 13, 2004, Dr. Berry injected the subacromial space with cortisone (Tr. 153). Dr. Berry considered a shoulder arthroscopy for diagnostic purposes on February 18, 2004 (Tr. 155). After Plaintiff saw a psychologist, Dr. Berry prescribed an antidepressant on March 30, 2004 (Tr. 157).

Christopher L. Smith, a physical therapist, prepared a plan of care for Plaintiff on May 27, 2004 (Tr. 174). Plaintiff's pain level had been decreased and his range of motion maximized when he was discharged from therapy on January 2, 2005 (Tr. 178-186).

On February 13, 2003, the MRI of Plaintiff's right shoulder showed evidence of degenerative bone changes at the proximal humerus (Tr. 191).

In July 2003, Dr. Raymond D. Richetta, Ph. D., a psychologist, conducted a clinical interview and administered the Beck Depression Inventory (Tr. 239-244). The results from the inventory suggested a

moderate level of depression (Tr. 242).

Plaintiff commenced a course of physical therapy on August 15, 2003, that consisted of forty-five visits. Plaintiff's progress plateaued over the course of six to eight weeks (Tr. 311-329).

Dr. Richetta conducted individual psychotherapy commencing on March 25, 2004 (Tr. 245). Dr. Richetta saw Plaintiff on three occasions, discharging Plaintiff for lack of participation on March 7, 2005 (Tr. 250).

In April 2005, Dr. Richetta reintroduced Plaintiff to individual psychotherapy to reduce depression and address anger issues. Plaintiff's depressed mood was correlated to aggravated shoulder pain (Tr. 260). His pain was intensified when engaging in regular activities (Tr. 255). During April his mood was generally stable (Tr. 254). Dr. Richetta noted on August 22, 2005, that he was unable to break the cycle of anger and negative thinking (Tr. 264).

Dr. Mark S. Schickendantz performed an arthroscopy on Plaintiff's right shoulder on May 10, 2004. The postoperative plan of care included use of a sling for two weeks (Tr. 228). Plaintiff was progressing well in July 2004 (Tr. 229). In August 2004, Plaintiff was doing very well (Tr. 230). In October 2004, Plaintiff was still steadily improving (Tr. 231).

On May 27, 2004, a plan of care to increase Plaintiff's range of motion and strengthening was developed (Tr. 281-286, 308). His last physical therapy session was on January 18, 2005. At the conclusion of fifty-seven visits, the severity of Plaintiff's pain was commensurate with the level of activity (Tr. 284, 288-307).

In January 2005, Plaintiff was prescribed eight weeks of work conditioning (Tr. 232). In March 2005, Plaintiff's right shoulder was continuing to progress well (Tr. 233). In September 2005, Dr. Schickendantz diagnosed Plaintiff with impingement of the left shoulder with possible rotator cuff tear and

5

tendinitis (Tr. 235).

On March 23, 2005, Dr. Peter S. Kibbe confirmed the presence of chronic bursitis, bicipital tendinitis and subdeltoid bursitis (Tr. 194).

Dr. Alice L. Chambly, Psy. D. opined on May 20, 2005, that Plaintiff had moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time and complete a normal workday and workweek without interruptions (Tr. 195, 196). It was her opinion that Plaintiff suffered from a dysthymic disorder (Tr. 202).

Dr. Dimitri Teague opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 214). Plaintiff could never climb using a ladder, rope or scaffold and Plaintiff could occasionally crawl (Tr. 215). Plaintiff's ability to reach in all directions was limited (Tr. 216). He had no communicative, environmental or visual limitations (Tr. 216-217).

The MRI of Plaintiff's left shoulder showed moderately advanced tendinitis/tendinosis, mild medial subluxation of the long head of the biceps, small joint effusion and circumferential degeneration (Tr. 237). Dr. Schickendantz found evidence of chronic impingement of the left shoulder on September 22, 2005 (Tr. 238).

At the request of the Disability Determination Services, an unidentified physician conducted a review of all the evidence and determined that Plaintiff could lift twenty pounds occasionally, ten pounds frequently, stand about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 267). Plaintiff could never climb and occasionally crawl

(Tr. 268). Plaintiff was limited in his ability to reach in all directions (Tr. 269).

Plaintiff was assessed on January 21, 2005, for physical/occupational therapy (Tr. 278). He failed to appear for the first appointment and the services were discontinued on January 24, 2005 (Tr. 279, 288).

Plaintiff underwent a left shoulder arthroscopy on February 13, 2006 (Tr. 465).

A plan of care for physical therapy was created on February 27, 2006. Plaintiff was seen once for the evaluation (Tr. 274, 276).

In March 2006, Plaintiff resumed treatment with Dr. Richetta for purposes of increasing coping strategies and reducing depressed mood (Tr. 383). The x-ray of Plaintiff's left shoulder showed no significant soft or boney tissue abnormality (Tr. 449). The results from the MRI administered on May 4, 2006, showed a partial thickness undersurface tear of the supraspinatus tendon and a rupture of the biceps tendon (Tr. 441). Although Dr. Schickendantz considered Plaintiff's condition clinically improved in July 2006, Plaintiff continued to have pain in his shoulder with movement in August 2006 (Tr. 430, 432).

Plaintiff underwent arthroscopy on March 19, 2007 (Tr. 406, 421). In April 2007, Plaintiff was progressing well (Tr. 401). He began physical/occupational therapy on June 7, 2007 (Tr. 309).

The results of the nerve conduction study conducted on June 22, 2007, were normal (Tr. 399). On September 28, 2007, Dr. Schickendantz diagnosed Plaintiff with acute cervical radiculopathy affecting his left arm (Tr. 392).

On January 31, 2008, Dr. Schickendantz diagnosed Plaintiff with ongoing pain of the bilateral shoulders, including radicular pain in the left arm (Tr. 387). On March 21, 2008, Plaintiff was prescribed medication designed to treat symptoms of pain and seizures (Tr. 384). He released Plaintiff to return to work on March 22, 2008 (Tr. 385).

## IV. STANDARD FOR DISABILITY

"The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920, respectively." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520 (a)(4) (Thomson West 2009).

First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. 20 C.F.R. §§ 404.1520 (a)(4)(i) and 416.920(a)(4)(i) (Thomson West 2009).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. 20 C.F.R. §§ 404.1520 (a)(4)(ii) and 416.920(a)(4)(ii) (Thomson West 2009).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §§ 404.1520 (a)(4)(iii) and 416.920(a)(4)(iii) (Thomson West 2009).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner

determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. 20 C.F.R. §§ 404.1520 (a)(4)(iv) and 416.920(a)(4)(iv)(Thomson West 2009).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520 (a)(4)(v) and 416.920(a)(4) (iv) (Thomson West 2009).

## V. THE ALJ'S FINDINGS

The ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Act on December 31, 2004.

2. Plaintiff had not engaged in substantial gainful activity from November 3, 1999, through his date last insured of December 31, 2004.

3. Through the date last insured, Plaintiff had the severe impairments of a torn rotator cuff with detachment of right biceps tendon. Plaintiff did not have any impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C. F. R., Part 404, Subpart P, Appendix 1 of 20 C. F. R. §§ 404.1520(d), 404.1525 and 404.1526.

4. Plaintiff had the residual functional capacity (RFC) to perform light work except that he had to avoid climbing on ladders, ropes and scaffolds, engaging in crawling on other than an occasional basis and was limited against extensive reaching, including overhead with his right upper extremity.

5. Through the date last insured, considering Plaintiff's age, education, vocational background and RFC, there were jobs in the national economy that Plaintiff could perform.

6. Plaintiff was not under a disability as defined under the Act.

(Tr. 14-24).

## VI.  STANDARD OF REVIEW

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383 (c)(3).  *McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 832-33 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.  'Substantial evidence' means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept.'"  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (*citing Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  Furthermore, the court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."  *Id*. (*citing Key, supra*, 109 F.3d at 273).

## VII.  DISCUSSION

In his brief, Plaintiff asserts three assignments of error.  First, the ALJ erroneously determined that his left shoulder and mental impairments were not severe.  Second, the ALJ's determination that there are jobs in significant number that Plaintiff can perform is not supported by substantial evidence.  Third, remand is necessary for further evaluation.

Defendant reiterates that only the evidence prior to Plaintiff's date last insured on December 31, 2004, is relevant.  In response to Plaintiff's contentions, Defendant argues that the ALJ need not designate

10

each impairment as severe or not severe. In addition, substantial evidence supports the ALJ's decision in its entirety including his finding at step five of the sequential evaluation.

### 1. THE SEVERITY OF IMPAIRMENT.

Plaintiff contends that there is substantial evidence in the record to support a conclusion that Plaintiff's shoulder impingement and dysthymic disorder with irritability interfering with public interaction, impaired concentration and an interrupted wake sleep cycle, were of the severity to prohibit any employment. Moreover, the reference by state agency psychologist to Section 12.04 of the Listing codified at 20 C. F. R. Pt. 404, Subpt. P, App. 1, attests to the severity of his mental impairment.

Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered. TITLES II AND XVI: MEDICAL IMPAIRMENTS THAT ARE NOT SEVERE, SOCIAL SECURITY RULING (SSR) 85-28, 1985 WL 56856, *3 (1985). Under 20 C.F.R. §§ 404.1523 and 416.923, when assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone. SSR 85-28, at *3. A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe. SSR 85-28, at *3. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process. SSR 85-28, at *3.

The ALJ conducted a careful evaluation of the medical findings which described the diagnosis of dysthymia and the attendant treatment of dysthymic symptoms (Tr. 16, 17). The ALJ followed the procedural rules but there is simply a lack of substantial evidence that the diagnosis of dysthymia rose to

the level of severity contemplated in the regulations. Results adduced from the Beck Inventory administered by Dr. Richetta showed that Plaintiff had a moderate level of depression (Tr. 242). Dr. Richetta inferred that Plaintiff's depressed mood was episodic, the onset of which occurred with pain, thoughts of increased time for rehabilitation, reinjury of his rotator cuff and psychosocial stressors (Tr. 260, 376, 377, 381, 383). However, during the course of treatment, Dr. Richetta noted that Plaintiff's depressed mood continued to decrease (Tr. 378, 379, 380). Insofar as the state agency psychologist referred to Plaintiff's mental impairment, she rendered an opinion that Plaintiff did not have a medically determinable impairment that satisfied the diagnostic criteria of Section 12.04.

The state agency psychologist's reference to Section 12.04 of the Listing does not attest to the severity of mental impairment to the extent argued by Plaintiff. In fact, the state agency psychologist's opinion offers little by way of objective medical evidence that Plaintiff had a severe mental impairment that affected Plaintiff's functional abilities. Neither Dr. Richetta nor the state agency psychologist found that Plaintiff's functional limitations were markedly affected as a result of Plaintiff's dysthymic disorder (Tr. 16-17, 209).

Upon review of the entire record, the Magistrate defers to the ALJ's decision that there is a lack of substantial evidence to support a conclusion that Plaintiff had a severe mental impairment.

    **2.**    **THE STATE AGENCY PSYCHOLOGIST.**

Plaintiff contends that the ALJ was obliged to mention and discuss the state agency psychologist's opinion that he had an affective disorder as defined under 12.04 of the Listing. Consequently, a remand to the Commissioner is warranted so the ALJ can discuss the state agency psychological consultant's opinion.

State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability

evaluation. POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p, *2 (July 2, 1996). ALJs **must** consider findings of state agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether the claimant is disabled. 20 C. F. R. §§ 404.1527(f)(2)(i) and 416.927(f)(2)(i) (Thomson West 2009).

However, ALJs are not bound by any findings made by state agency medical or psychological consultants. 20 C. F. R. §§ 404.1527(f)(2)(i) and 416.927(f)(2)(i) (Thomson West 2009). The opinions of state agency medical and psychological consultants can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Councils levels that was not before the state agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program physician or psychologist. SSR 96-6p at *3.

Although the ALJ did not identify the state agency psychologist as the source, he acknowledged the opinions of all state agency medical consultants (Tr. 18). The ALJ had discretion in determining whether to attribute any weight to Dr. Chambley's opinion. However, the ALJ suggests that the state agency psychologist's opinion is not relevant to Plaintiff's claim that he was disabled on or before the date last insured.

Typically, post insured status evidence of a claimant's condition is generally not relevant. *Jones v. Astrue,* 2009 WL 1270314, *6 (S. D. Ohio 2009) (*citing Bagby v. Harris,* 650 F.2d 836 (6th Cir. 1981); *see*

13

*also, Bogle v. Secretary of Health and Human Services,* 998 F.2d 342 (6th Cir. 1993)). However, such evidence will be considered if it establishes that an impairment existed continuously and in the same degree from the date the insured status expired. *Id.* (*citing Johnson v. Secretary of Health and Human Services,* 679 F.2d 605 (6th Cir. 1982)).

Because his insured status expired on December 31, 2004, and the state agency psychologists conducted his evaluation after the expiration of the insured status, the ALJ was not bound by such decision. Unlike Dr. Richetta's treatment that commenced prior to and extended after the expiration of the insured status, the state agency psychologist's opinions offer nothing of a probative nature that establishes the continual existence of an impairment in the same degree from the date the insured status expired.

### 3. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff's third claim is construed as an allegation that the ALJ failed to consider the state agency physician's opinion that he could perform no more than occasional overhead reaching with his left upper extremity, was limited to simple routine tasks and was moderately impaired in social functioning. The Magistrate finds that consistent with Plaintiff's requests, the ALJ did consider the findings of the state agency consultant when assessing residual functional capacity (Tr. 22-23). Specifically, the ALJ's RFC finding reflects the state agency consultant's findings that Plaintiff cannot perform more than occasional overhead reaching in his upper extremities and there was no evidence that Plaintiff was relegated to performing simple, routine tasks.

## VIII. CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed and this case is dismissed.

**IT IS SO ORDERED**.

<u>/s/ Vernelis K. Armstrong</u>
United States Magistrate Judge

Date: November 25, 2009